George W. Ritter v. Commissioner.
George W. Ritter v. Commissioner
Docket No. 9096.
United States Tax Court
1946 Tax Ct. Memo LEXIS 63; 5 T.C.M. (CCH) 849; T.C.M. (RIA) 46237; October 9, 1946
James F. Holden, Esq., 240 Huron St., Toledo, Ohio, for the petitioner. Clarence E. Price, Esq., for the respondent. KERN Memorandum Findings of Fact and Opinion The Commissioner determined a deficiency in petitioner's income tax for the calendar year 1941 in the amount of $11,640.60. The issues relate to the disallowance of deductions for depreciation, on a yacht, for expenses incident to the repair of buildings on a farm, and for bad debts and losses. Findings of Fact Petitioner is an individual taxpayer, residing in Toledo, Ohio. A stipulation *64 of facts was filed, and we find the facts contained therein to be as stipulated. Evidence was adduced at the hearing herein and we set out here so much of the stipulated facts and the facts shown by the evidence as are required for the presentation of the issues. Eljumar Early in 1937 petitioner purchased a forty-two foot gas screw wood cabin cruiser called "Eljumar". He paid $7,500 for it. When it was put in the water in the spring of 1937, petitioner was dissatisfied with it and considered it unsuitable for the use which he had intended making of it. He offered it for sale through a boat broker almost immediately thereafter, but the boat was not sold until 1943 or 1944. Later in 1937, petitioner purchased a larger boat, and he used the "Eljumar" only four or five times during 1937 and 1938. He did not use it at all in 1940 or thereafter. He spent $342.04 for its repair and maintenance in 1941. In his income tax return for 1941, petitioner deducted $507.04 for care, upkeep and repairs on the boat, and $776.37 for depreciation. Farm Petitioner purchased a 212-acre farm, called the "Huebner Farm", in 1937. The tenant house on the farm was occupied by a tenant farmer, but *65 the master's house was then, and until 1945, remained, unoccupied. In 1941, petitioner inspected the property, and noted that the windows of the master's house had been broken in, and the slate roof was leaking, so that the weathering, to which the interior of the house was thus exposed, was causing the plaster to loosen and the floors to bulge. Petitioner engaged a roofer who examined the roof and advised petitioner that it would cost less to have an asphalt roof put on than to repair the slate. Petitioner also learned that the conductor pipes in the house were leaking, and he had them replaced. He paid a total of $448.50 for these items. In the same year, petitioner had some repairs made to the tenant house on the Huebner Farm, and he spent a total of $81.11 for that work. 1005 Adams Street In 1919 petitioner and Daniel W. Bliss purchased real estate located at 1005 Adams Street in Toledo, Ohio, under a land contract for $60,000. In 1922 they borrowed money on the property, which they used to pay off the balance due under the 1919 land contract, and a deed was delivered to petitioner and Daniel W. Bliss as grantees. On July 1, 1928, petitioner and Daniel W. Bliss executed *66 and delivered bonds in the aggregate principal sum of $50,000 payable to bearer, bearing interest at the rate of 6 percent per annum payable semi-annually. $29,000 of the proceeds from the issuance of the bonds was applied to the payment of the balance of the 1922 indebtedness, and the balance after paying expenses, was divided between petitioner and Daniel W. Bliss. The bonds were a joint and several obligation of petitioner and Daniel W. Bliss. On July 1, 1928, petitioner and Daniel W. Bliss executed and delivered a mortgage to the Commercial Savings Bank & Trust Company, as trustee, to secure the bonds. In 1930 or 1931, the property became vacant, and taxes against the property became delinquent. The bonds were in default in 1931. In 1933, certain bondholders indicated to petitioner their fear that the title to the property would become involved in financial difficulties which Mr. Bliss was undergoing, and suggested to petitioner that if Bliss would give petitioner a deed to his interest in the property, they would refrain from initiating foreclosure proceedings at that time, and would carry on until the general financial situation cleared up. Bliss agreed to this proposal and *67 executed a deed conveying to petitioner his interest in the property. During 1934, petitioner purchased through a broker bonds of the face value of $7,500 at a cost of $2,460. In 1935, before April, petitioner bought additional bonds of the face value of $5,000 for $2,422. He then held bonds of the aggregate face value of $12,500. Later in 1935 or 1936 petitioner agreed with Harry W. Wachter, who, with his sister, owned a total of $31,000 face amount of bonds, that petitioner would purchase the $6,500 still owned by others, and would pay the taxes on the property, and Wachter and his sister would agree to cancellation of the $31,000 in bonds held by them, and would accept petitioner's notes and a first mortgage on the property in the amount of $23,250, with interest at the rate of 2 1/2 per cent per annum. Pursuant to this agreement, petitioner purchased the $6,500 face amount of bonds for $4,110.00, and delivered the $19,000 face amount of bonds then held in escrow to the Ohio Citizens Trust Company for the purpose of accomplishing the agreement with Wachter, together with two notes, in the amount of $7,500 and $15,750, respectively, dated December 15, 1936, bearing interest at *68 3 percent per annum, and the first mortgage securing the payment of the notes, pending delivery by the Wachter interests of their bonds in the face amount of $31,000. By January of 1937, the entire issue of bonds was delivered to the trustee under the 1928 mortgage, and were cremated. The 1928 mortgage was released of record, and petitioner's mortgage to Harry W. Wachter was recorded. In February of 1937, petitioner wrote a letter to Daniel W. Bliss in the following language: Dear Dan: I have acquired the $50,000 of bonds signed by you and me, secured by a mortgage on the Adams Street property, and have destroyed them. You are released and discharged from any obligation on account of these bonds. I thought you would be glad to know about this. This letter followed a consultation between petitioner and Bliss, in which Bliss stated that he was contemplating filing a petition in bankruptcy. Petitioner told him he need not go into bankruptcy on account of any liability on the bonds (then held by petitioner) and wrote the letter set out above. In 1941, petitioner paid $15,250 on the notes executed by him on December 15, 1936. Daniel W. Bliss was insolvent in 1941. 1009 Adams *69 Street, Toledo In 1928, petitioner, Daniel W. Bliss and E. D. Sowden were stockholders in The Bliss Auto Sales Company, which entered into a contract of purchase dated April 15, 1928, with Charles A. Thatcher and The Goodale Realty Company, to purchase property at 1009 Adams Street for $39,000, payable $1,000 on July 1, 1928, and $1,000 every six months thereafter with interest at 6 percent annually, payable semi-annually. The three individual stockholders of The Bliss Auto Sales Company, including petitioner, guaranteed the payment of the purchase price by an agreement which provided as follows: In consideration of One Dollar ($1.00) to us in hand paid and the execution of the within contract by the seller, we, the undersigned, being interested in The Bliss Auto Sales Company, hereby guarantee payment of each and all of the obligations provided for on behalf of said The Bliss Auto Sales Company in the foregoing contract upon the following express conditions: (a) that in the event of the death of any of the undersigned, this guaranty obligation shall be released and discharged by the personal representative of such deceased as and when Three Thousand Dollars ($3,000.00) has *70 been paid on the purchase price agreed to be paid on the within contract; (b) that the seller shall within a reasonable time notify, in writing, the undersigned as to any default on the part of the purchaser. D. W. Bliss E. D. Sowden Geo. W. Ritter The Bliss Auto Sales Co. filed a voluntary petition in bankruptcy on November 20, 1930. On February 10, 1933, The Goodale Realty Co. and Charles A. Thatcher filed suit in the Court of Common Pleas of Lucas County, Ohio, against the Bliss Auto Sales Co. to recover $46,499.31, with interest from January 15, 1933, being the amount of the balance due from the Bliss Auto Sales Co. on the land contract, and joined petitioner in said suit alleging the right to recover under the April 15, 1928, guaranty. Upon demurrer petitioner was dismissed as a defendant in the litigation without prejudice. While this suit was pending, Charles A. Thatcher died. Judgment was entered against the Bliss Auto Sales Co. in the amount of $54,993.18, with interest from February 1, 1936, and the property was purchased on foreclosure by the Toledo Trust Co., Executor of the Estate of Charles A. Thatcher, for $13,334. Early in the summer of 1941 attorneys for *71 the Trust Co., indicated to petitioner that they contemplated proceeding against him on his guaranty. They offered to release him therefrom and to convey the property to him for $20,000. This he refused. It was agreed that the property be appraised. The parties agreed on an appraisal of $12,000. Petitioner agreed to pay $2,000 for a release from liability under his guaranty and $12,000 for the property. On August 27, 1941, petitioner delivered to The Toledo Trust Co., Executor, his check for $1,000 and his promissory note for $13,000 secured by a mortgage on the property at 1009 Adams Street, and received from The Toledo Trust Co., Executor, and The Goodale Realty Co. a deed dated August 27, 1941, to the property at 1009 Adams Street, reciting a consideration of $14,000, and a release dated August 28, 1941, from his liability upon the guaranty dated April 15, 1928, in full and complete settlement of the claims and causes of action which had arisen or might have arisen by reason of deficiencies resulting from the balance due for the purchase of the real estate under the terms of the agreement of April 15, 1928, and the proceeds of the sheriff's sale in the litigation referred to. *72 Contemporaneously, petitioner entered on his own books a record of the transaction showing the sum of $2,000 charged to him for the release and $12,000 charged as the purchase price of the property. During the remaining months of 1941, petitioner paid $400 on his note of August 27, 1941, to The Toledo Trust Co, Executor. The cash payments made by petitioner in 1941 in the total amount of $1,400 were intended by the parties to be in part payment for the release of petitioner's liability under the guaranty. The Bliss Auto Sales Co. was insolvent in 1941. Gould Realty Investment Co. The Gould Realty Investment Co. was a corporation organized by Leland G. Gardner, David A. Yoder and petitioner in 1921. Gardner and Yoder furnished the money and petitioner furnished legal services in the organization of the corporation. Their agreement was that one-third of the stock was to be issued in petitioner's name, but was not to be delivered until Gardner and Yoder had been reimbursed from the profits of the corporation for the money invested by them, at which time petitioner should receive his stock. On June 27, 1930, the Gould Realty Investment Co. gave to the Penn Mutual Insurance Co. *73 a mortgage on certain real estate on Adams Street in Toledo to secure a loan of forty thousand dollars ($40,000), payment of which loan was guaranteed by petitioner, Yoder and Gardner. In 1941, the loan was in default, and the Penn Mutual Life Insurance Co. employed counsel who, on August 25, 1941, advised the Gould Realty Investment Co. as follows: Dear Sirs: Please be advised that The Penn Mutual Life Insurance Company has placed in our hands for collection its claim against you evidenced in part by your note for $40,000 dated June 27, 1930 (guaranteed by Messrs. David A. Yoder, George W. Ritter and Leland G. Gardner) and by mortgage on premises known as 1105-7-9 Adams Street, Toledo, Ohio, which mortgage is recorded in Vol. 979 of Real Estate Mortgages, page 354 in the Office of the County Recorder of Lucas County. Our instructions are to file suit to enforce this claim unless this matter is settled by September 4th on some basis satisfactory to our client. We are sending copies of this letter to Messrs. Yoder, Ritter and Gardner for their information. Very truly yours, (Signed) MARSHALL MELHORN DAVIES WALL & BLOCH When petitioner received this notice of the corporation's *74 ability to pay the debt, he discussed the possibility of a settlement with a representative of the insurance company, who advised petitioner that the amount then due was $49,383.58. Yoder and Gardner informed petitioner they were unable to contribute anything toward a settlement, and petitioner then negotiated a settlement with Penn Mutual by the terms of which Penn Mutual agreed to reduce the indebtedness to $32,600, and extend the time for payment of the principal conditioned upon payment to it before December 24, 1941, of $10,060.68 plus interest on the principal from July 1, 1941, at 4 1/2 percent. At that time the property owned by Gould Realty Investment Co. had a fair market value of $35,000. Petitioner paid $9,060.68 in 1941 pursuant to the settlement agreement negotiated by him, and Penn Mutual agreed to allow him additional time to pay the remaining $1,000 upon which they had agreed. The insurance company cancelled the old note and mortgage and the Gould Realty Investment Co. gave a new note for $32,000, which was guaranteed by petitioner, Yoder and Gardner and a new mortgage securing the note. Between 1937 and 1941, petitioner had advanced in excess of $2,297.38 to the *75 Gould Realty Investment Co., by way of payments directly to its creditors for its obligations, consisting mainly of interest on the mortgage, capital stock taxes and franchise taxes. In 1941 petitioner paid taxes of the company in the amount of $2,845.86. The Gould Realty Investment Co.'s only asset (other than its cash balance) and only source of income was the property subject to the Penn Mutual mortgage. The rental income was not and had not been since 1921 sufficient to pay the carrying charges. It had in 1941 a cash balance of $135. It was insolvent in 1941 and was unable to pay its debts to petitioner in that year. There were outstanding in 1941 one judgment against David A. Yoder in the amount of $28,942.31, which was fully paid and satisfied of record in 1942, and one judgment in the amount of $78,539.60 against Yoder and another, pursuant to which no execution was issued and which was still unsatisfied of record in 1946. Yoder and Gardner continued to hold all the stock of the realty company through 1941, including that issued in petitioner's name. No litigation was ever undertaken by Penn Mutual in connection with this matter. Opinion KERN, Judge: Eljumar The *76 first of the issues presented here relates to the disallowance by respondent of expense items and depreciation as deductions in petitioner's income tax returns on a boat owned by him, called "Eljumar". Petitioner does not contend this deduction was a business expense, He claims the deduction for expenses under section 23(a)(2) which allows a deduction, in the case of an individual, for all the ordinary and necessary expenses paid or incurred during the taxable year for the production or collection of income, or for the management, conservation, or maintenance of property held for the production of income. Regulations 111, section 29.23(a)-15 provides that the income referred to in that section includes gains from the disposition of property. It is petitioner's contention that he held the property for sale from 1937, when he listed it with a broker, through the tax year, and that he is therefore entitled to deduct his expenses under this section of the Code. In Warren Leslie, Sr., 6 T.C. 488, the taxpayers owned a residence which they had occupied for a number of years, *77 but which was badly damaged and rendered uninhabitable by a hurricane in 1938. They decided to sell the property, rather than to try to repair it for further use by them, and they agreed that a real estate agent might try to secure an offer for it. None was secured. They employed a caretaker and incurred other expenses during 1940, which they contended were deductible as nonbusiness expenses under section 23(a)(2) of the Code. We held they were not entitled to the deduction, since there was not a sufficient showing of conversion or appropriation to income-producing purposes from personal use. We think this case is analogous to the facts before us. The case of Mary Laughlin Robinson, 2 T.C. 305, was distinguished by the fact that the property there was offered for rent, and part was actually rented, prior to the sale. In Estelle G. Marx, 5 T.C. 173, the yacht was not acquired nor was it ever held or used for personal use. We conclude, following Warren Leslie, Sr., supra, that respondent did not err in denying the claimed deductions for expenses and depreciation *78 on account of the yacht. Farm Expenditures During 1941, petitioner owned the "Huebner Farm" on which he expended $448.50 for a new asphalt roof to replace a slate roof and to install new conductor pipes. The old roof was leaking, and petitioner was advised to replace the roof rather than to repair it, which was done. The conductor pipes in the house leaked, and their replacement was also required. These were in an unoccupied house on a farm owned by petitioner. The decisions are uniform that a new roof is a capital item, not chargeable to expense. Cotton Concentration Co., 4 B.T.A. 121; Crocker Co., Inc., 15 B.T.A. 175. The conductor pipes, also, were not repaired. They were replaced. We think that cost, too, must be capitalized. The other items are shown by the evidence to have been expended for lumber, nails, paint, glass, and similar items for the repairing of floors, broken windows, plaster, etc. both in the large, unoccupied house referred to above, and the tenant house on the same farm. These expenditures were in a total amount of $81.11. They *79 are, we think, proper items of expense and allowable as such. 1005 Adams Street Petitioner seeks to deduct as a bad debt one-half of the amount paid by him in the tax year in discharge of promissory notes issued by him in an earlier year as a step in a compromise settlement of an obligation on bonds on which he and David Bliss were jointly and severally liable. The bonds were issued in 1928, and were secured by a mortgage on real estate held by them as tenants in common. In 1933, Bliss deeded his interest in the real estate then worth $31,000 to petitioner, and by 1937 petitioner had acquired by purchase at less than face value all the bonds, at which time he notified Bliss that he was released from liability thereon. Petitioner had paid for the bonds thus acquired $8,992 cash, and given his promissory notes totalling $23,250. He paid $15,250 on the notes in 1941, and claims a bad debt deduction, arising by way of his right of contribution against Bliss, in the amount of $7,625. Going back to the transfer by Bliss to petitioner, in 1933, of the mortgaged real estate, petitioner testified that it was made at the request of the bondholders, who feared its involvement in other *80 financial difficulties of Bliss. Petitioner testified Bliss transferred his interest in the property to petitioner "without any consideration and without any promise". Nevertheless, we can not assume it was intended by any of the parties to the arrangement to be a gift from Bliss to petitioner. The primary purpose of the transfer, as instigated by the creditors, was to safeguard the property from any possible application to other debts of Bliss, and one must assume, to preserve it for application, if need be, to the obligations represented by the bonds. Later on, petitioner gave Bliss a written release from all obligation on the bonds. Respondent argues earnestly that the transfer to petitioner of the security must have been in consideration of his later release from obligation under the bonds. We think it is a reasonable conclusion to be drawn from the facts that Bliss intended, and the parties to the transaction understood, that he (Bliss) as a result of this transfer and in partial consideration therefor was to be ultimately free from any personal liability upon the bonds secured by the property transferred by Bliss to petitioner. We can not believe Bliss intended, in his circumstances, *81 to make a gift to his co-obligor of the property mortgaged to secure payment of the bonds since he would be entitled, at the very least, to have the value of the property so transferred credited against his obligation under the bonds, and that value was very close to the amount which petitioner paid for the bonds. We are of the opinion that the transfer of the property, and the later release of Bliss from obligation, both of which petitioner says were without consideration, constituted under the facts here present, consideration for each other. Even if this were not so, and if it were true that petitioner gave Bliss a release for the sole purpose of inducing Bliss to refrain from initiating voluntary bankruptcy proceedings, the release was based on adequate legal consideration even though Bliss's refraining from bankruptcy was of no value or benefit to petitioner. Section 103, Vol. 17, C.J.S. We therefore conclude that petitioner had no right of contribution against Bliss in any amount growing out of this transaction, and, consequently, no deductible bad debt in the taxable year resulting therefrom. 1009 Adams Street The question presented by the facts here, which are fully *82 set out in our findings, is whether petitioner is entitled to deduct as a bad debt the sum of $1,400 which petitioner contends he paid in 1941 in settlement of his liability on the guaranty executed by himself, Bliss and Sowden, and resulting in petitioner's subrogation in that amount to the creditor's rights against an insolvent debtor. Respondent contends that petitioner paid $14,000 for the real estate, since the court order authorizing the sale specifies the consideration as $14,000, and the deed by which title was transferred named $14,000 as the consideration for the transfer. Petitioner contends, nevertheless, that he obligated himself to pay $12,000 for the property and $2,000 for the release, and that the payments made in 1941 were payments intended by the parties to be applied to the release. After consideration of the entire evidence we are of the opinion that petitioner's interpretation, though at variance with the terms of the formal documents, represented the true agreement of the parties at the time. The claimed loss is, in our opinion, allowable. Gould Realty Investment Co. Petitioner paid $9,060.68 in 1941 by reason of the guaranty executed by himself, *83 Yoder and Gardner. He claims a deduction as a bad debt of $3,020.22 which is his share of the guaranty payment, and a bad debt deduction by reason of the insolvency of Yoder, against whom he had a right of contribution in the amount of $3,020.22. Petitioner admitted his inability to establish the insolvency of Gardner, his other co-guarantor. He further claims a deduction as a bad debt of $2,297.38 which he had advanced to the Gould Realty Investment Co. by payments directly to its creditors from 1937 to 1941. With respect to his share of the guaranty payment, we think petitioner is entitled to a bad debt deduction. See Robert S. Farrell, 44 B.T.A. 238; C. H. White, 15 B.T.A. 1375. The evidence shows that the indebtedness of the company to petitioner, arising by reason of his subrogation to the rights of the insurance company, was uncollectible in the taxable year. The debt was worthless as soon as it was created. See Shiman v. Commissioner, 60 Fed. (2d) 65. With respect to petitioner's right to contribution against Yoder, and his inability to *84 discharge such an obligation, we are unable to find sufficient evidence in the record from which we could find, as an ultimate fact, that Yoder was insolvent. There is no direct testimony whatever to that effect, and no evidence relating to Yoder's general financial situation from which we can find such to be the fact. There is in evidence a certified copy of an unsatisfied judgment against Yoder and George B. Horen entered in 1940, upon which no execution was ever issued, and a certified copy of another judgment against Yoder alone entered in 1941, which latter judgment was later fully satisfied in 1942. We are unable to say from such evidence alone that Yoder was insolvent. The evidence relating to the claimed deduction of $2,297.38, which petitioner claims was paid to the creditors of Gould Realty Investment Co. from 1937 to 1941, is far from satisfactory. The checks evidencing these payments and introduced in evidence to substantiate this deduction are in a total amount far in excess of the deduction claimed. Two of them were drawn in 1941 by petitioner for the purpose of paying the company's taxes and totalled $2,845.86. We conclude that the company thereby became indebted to *85 petitioner in that amount in 1941. Since, as we have indicated, our conclusion is that the indebtedness of the company to petitioner was uncollectible in 1941, the deduction in the amount claimed as a bad debt is allowable. Decision will be entered under Rule 50.